E. MARTIN ESTRADA
United States Attorney
ANNAMARTINE M. SALICK
Assistant United States Attorney
Chief, National Security Division
AMANDA B. ELBOGEN (Cal. Bar No. 332505)
Assistant United States Attorneys
Terrorism and Export Crimes Section
    United States Attorney's Office
    312 N. Spring St., 15th floor
    Los Angeles, California 90012
    Telephone:  (213) 894-5748
    Facsimile:  (213) 894-0141
    Email:    amanda.elbogen@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>ANDRE MORROW LACKNER,<br><br>        Defendant. | No. CR 22-00603-DSF (AS)<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPLICATION FOR PRETRIAL RELEASE<br><br>Hearing Date: May 4, 2023<br>Hearing Time: 1:00 p.m.<br><br>Location:    Courtroom of the<br>            Hon. Alka Sagar |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and undersigned counsel, hereby files this Opposition to Defendant's Application for Pretrial Release.  This Opposition is based on the attached Memorandum of Points and Authorities, the files

\\

\\

1  and records in this case, and any additional evidence and argument

2  that the Court may receive at the hearing.

3  Dated: May 3, 2023                    Respectfully submitted,

4                                        E. MARTIN ESTRADA
                                         United States Attorney
5
                                         ANNAMARTINE M. SALICK
6                                        Assistant United States Attorney
                                         Chief, National Security Division
7
                                         _____/s/_____
8                                        AMANDA B. ELBOGEN
                                         Assistant United States Attorney
9
                                         Attorneys for Plaintiff
10                                       UNITED STATES OF AMERICA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.      INTRODUCTION..................................................1

II.     LEGAL STANDARD................................................2

III.    FACTS                       ................................3

        A.    Defendant's Criminal History...........................3

              1.    Defendant's Prior Arrest and Conviction for
                    Making Terroristic Threats.......................3

        B.    Defendant's Public Threats to Kill Others..............4

              1.    "I want to kill as many people as I can".........4

              2.    2017 Threat to Shoot Up a School.................5

              3.    2020 Mass Killing Threat at Coachella Festival...5

              4.    2020 Mass Shooting Threat on a Cruise Ship.......6

              5.    Mass Shooting Threats on Discord.................7

        C.    Defendant's Mental Health Hold.........................8

        D.    Defendant's Harassment and Intimidation of Victim M.S..8

        E.    Procedural History....................................14

IV.     DEFENDANT HAS NO NEW INFORMATION.............................15

V.      DEFENDANT IS A DANGER TO THE COMMUNITY AND A FLIGHT RISK.....15

        A.    Nature and Circumstances of the Offenses..............16

        B.    Weight of the Evidence................................16

        C.    History and Characteristics of the Defendant..........16

              1.    Danger..........................................16

              2.    Risk of Nonappearance...........................18

        D.    Nature and Seriousness of the Danger to Any Person or
              the Community that Would Be Posed by the Defendant's
              Release...............................................18

VI.     CONCLUSION..................................................19

**TABLE OF AUTHORITIES**

**CASES**                                                                  **PAGE(S)**

United States v. Cardenas,
    784 F.2d 937 (9th Cir. 1986) ................................... 2

United States v. Dillon,
    938 F.2d 1412 (1st Cir. 1991) .............................. 3, 15

United States v. Hare,
    873 F.2d 796 (5th Cir. 1989) ................................... 3

United States v. Motamedi,
    767 F.2d 1403 (9th Cir. 1985) ................................. 2

United States v. Ward,
    63 F. Supp. 2d 1203 (C.D. Cal. 1999) .......................... 2

United States v. Winsor,
    785 F.2d 755 (9th Cir. 1986) .................................. 3

**STATUTES**

18 U.S.C. § 3142 ......................................... passim

18 U.S.C. §§ 2261A(2)(B), 2261(b)(5) ........................ 14, 16

California Penal Code § 422 ................................... 4

California Penal Code § 1203.4 ............................... 4

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3          Defendant Andre Lackner has threatened mass shootings at

4    schools, on cruise ships, and at the Coachella music festival.  In

5    2017, he called his former high school teacher and threatened to kill

6    her and her family.  Four days later, he showed up at the park where

7    she was walking her dog.  He has repeatedly threatened to kill Jews

8    in particular.  He is charged in this case with stalking victim M.S.,

9    whom he briefly dated in 2007 and stayed on friendly terms with.

10   Years after they dated, victim M.S. took him to the emergency room

11   after he had punched a hole in a wall in a fit of anger.  She

12   encouraged him to get mental health treatment even after he made

13   disturbing threats, and warned him that she would have to report him

14   if his threats continued and she felt his or others' safety was at

15   risk.  After his threats escalated, she reported him to the Federal

16   Bureau of Investigation ("FBI"), saying: "I am extremely concerned

17   that he will follow-through with one of his threats."  She stated

18   that she was fearful for herself and her family, and for the

19   community at large: "I am VERY concerned that he remembers where my

20   family lives and could go there and do something to them, or do

21   something like a mass shooting in a public place, etc. . . ."

22         Defendant now asks to be released on bond, a request the

23   government strongly opposes.  He blames his behavior on mental

24   illness and notes improvements to his mental health while in

25   detention, but fails to meaningfully address that he has been

26   diagnosed and treated for bipolar disorder for over a decade and has

27   not been able or willing to stop terrorizing others in the community,

28   particularly women.  Because he poses a serious danger to the safety

1   of the community, and poses a real risk of nonappearance, this Court
2   should deny the defendant's motion for pretrial release.

3   **II.   LEGAL STANDARD**

4          The Bail Reform Act of 1984 (the "Act") permits pretrial
5   detention of a defendant without bail where "no condition or
6   combination of conditions will reasonably assure the appearance of
7   the person as required and the safety of any other person and the
8   community." 18 U.S.C. § 3142(e).  Detention is appropriate where a
9   defendant is either a danger to the community or a flight risk; it is
10  not necessary to prove both.  United States v. Motamedi, 767 F.2d
11  1403, 1406 (9th Cir. 1985).  A finding that a defendant is a danger
12  to the community must be supported by clear and convincing evidence.
13  18 U.S.C. § 3142(f).  A finding that a defendant is a flight risk
14  need only be supported by a preponderance of the evidence.  Motamedi,
15  767 F.2d at 1406.  As in a preliminary hearing, the government may
16  proceed in a detention hearing by proffer or hearsay.  United States
17  v. Winsor, 785 F.2d 755, 756 (9th Cir. 1986)7; United States v.
18  Cardenas, 784 F.2d 937, 938 (9th Cir. 1986).

19         Once a detention determination has been made, a motion for bail
20  review can only be made "if the judicial officer finds that
21  information exists that was not known to the movant at the time of
22  the hearing," and that information "has a material bearing on the
23  issue whether there are conditions of release that will reasonably
24  assure the appearance of the person as required and the safety of any
25  other person and the community." 18 U.S.C. § 3142(f).  Courts have
26  interpreted this provision strictly, holding that hearings should not
27  be reopened if the evidence was available at the time of the initial
28  hearing.  See United States v. Ward, 63 F. Supp. 2d 1203, 1207 (C.D.

1  Cal. 1999); see also United States v. Dillon, 938 F.2d 1412, 1415

2  (1st Cir. 1991) (per curiam) (affirming district court's refusal to

3  reopen hearing where defendant's evidence consisted of affidavits and

4  letters from people who knew him attesting to his likelihood of

5  appearing and non-dangerousness; "this information was available to

6  appellant at the time of the [original] hearing"); United States v.

7  Hare, 873 F.2d 796, 799 (5th Cir. 1989) (affirming refusal to reopen

8  hearing because "testimony of [defendant]'s family and friends is not

9  new evidence").

10 **III. FACTS**

11     **A.    Defendant's Criminal History**

12         **1.    Defendant's Prior Arrest and Conviction for Making**

13               **Terroristic Threats**

14     On May 16, 2017, Victim T.T., a Venice High School teacher,

15 received a threatening phone call on her home from defendant, a

16 former student of hers.  Victim T.T. had not heard from defendant

17 since he graduated from high school in 2006.  In a police report

18 filed with the Los Angeles County Sheriff's Department ("LASD"),

19 Victim T.T. told LASD deputies that defendant said the following:

20 "Hello you fucking bitch. Why did you give me a DUU?"

21     Victim T.T. responded by asking who he was and recalls that

22 defendant responded, "don't worry who I am, I'll kill you and your

23 family, you fucking bitch and I know where your daughter lives.  I

24 can't tell you who I am because I'm fucking threatening you, you

25 fucking bitch.  I woke up at five in the morning I did all the

26 fundraising and paid for things with my own money."  Defendant added

27

28

that he was bipolar and had previously been incarcerated.[1]  He told
Victim T.T. that he would be calling again soon.  Victim T.T.
identified the caller as defendant because her caller ID showed the
name "ANDRE LACKNER" on her phone (which agents later verified
through the toll records), and she also recognized his voice.
Further investigation by LASD identified the phone number used to
make the threatening phone call as defendant's phone number.

Four days later, on May 20, 2017, Victim T.T. was walking in the
Rueben Ingold Park located at 4400 W. Mount Vernon Ave, Los Angeles,
CA when she noticed defendant walking in the park.  Defendant walked
out of view and Victim T.T. called the police.  Deputies responded
and after taking a report from Victim T.T., went to defendant's
registered home address at the time, 7070 Flight Ave, Unit #203, Los
Angeles, CA.  Deputies encountered defendant at the residence and
arrested him for the misdemeanor offense under California Penal Code
§ 422 (Criminal Threats).  Defendant was later convicted and
sentenced to 2 days' imprisonment and 36 months' probation.

## B.   Defendant's Public Threats to Kill Others

### 1.   "I want to kill as many people as I can"

On May 23, 2017, LASD was provided information regarding LACKNER
from a friend ("Witness #1") of Victim T.T., who heard about the case
and found LACKNER'S Instagram page online.  Witness #1 provided the
information to LASD because he/she saw a video in which he/she
remembered LACKNER saying, "I want to kill as many people as I can
and kill myself but I can't do that until my mom dies."

---

[1] On May 20, 2017, defendant was arrested of driving while under
the influence, and was sentenced to 13 days in jail and 36 months'
probation. The conviction was set aside and dismissed per California
Penal Code § 1203.4.

A complaint was made to Instagram and the video was removed from the web page.  The reported Instagram page was under the username "Andretheastronaut".

### 2.   2017 Threat to Shoot Up a School

On October 30, 2017, the FBI received an online tip regarding a school shooting threat in Los Angeles, CA.  An individual had viewed a song posted by user "Andre the Astronaut" with the title, "a temporary upload because I am already in legal trouble" on the website Soundcloud.  In the song, the user "Andre the Astronaut" threated to "shoot up a school" and stated he was "off his meds." The video has since been removed from Soundcloud.

Defendant was later linked to this threat, when, as described below, in 2022, the same username of "Andre the Astronaut" made a threat using similar language.  Law enforcement reviewed the Soundcloud homepage for user "Andre the Astronaut" and saw that it included a profile picture that matched the description of defendant's DMV photo.

### 3.   2020 Mass Killing Threat at Coachella Festival

On May 11, 2020, the FBI received a tip regarding user "Its_A_Nice_Day" on reddit.com ("Reddit") who posted about committing mass killings at the Coachella festival in Indio, CA.  The posts were on a forum that was created for the upcoming Coachella festival.  The post included the following message: "I always wanted to have a good coachella trip but I never could. Sometimes I get fantasies of doing a masskilling here like driving a truck through the audience, throwing grenades in the crowd, spraying a machine gun, going on stabbing spree, etc because I could never make it happen since im a

loser so it would be a good way to get revenge on the world but I know that they're just thoughts and I would never do it."

According to subscriber records provided by Reddit, the email address associated with the user "Its A Nice Day" is drestackems@gmail.com.  According to Google records, the recovery email address for the drestackems@gmail.com address is andrelackner@gmail.com, and the phone number associated with the account is (310) 989-2379 ("the 2379 Number").  According to public databases, the 2379 Number is associated with defendant.  On August 12, 2020, FBI Special Agents called the 2379 Number and defendant answered and identified himself.

      4.   2020 Mass Shooting Threat on a Cruise Ship

On May 28, 2022, the FBI again received tips regarding mass shooting threats that defendant made on Twitter and Discord.

The Twitter posts by user @DreStaxxxems, included the following statements:

        a.   "i am inspired by recent events to do a mass shooting on a cruise ship, can i buy guns in texas without being a resident? i know a lot of ships take off from the port there;" and

        b.   "i want to do a mass shooting on a cruise ship, i was planning to buy the guns in texas and and shoot my way onto one of the ships. I've been studying layouts and blueprints to find good trap areas. Can NRA make sure they can't restrict me from getting guns in texas?"

Law enforcement obtained screenshots of these posts.  According to Twitter records, the phone number associated with the @DreStaxxxems account is the 2379 Number.

1

                    5.   <u>Mass Shooting Threats on Discord</u>

2          The Discord posts by user "Earth God", with associated Instagram

3    account "andretheastronaut", included the following statements:

4               a.   "I think about socializing and remember the long list
     of ignored texts on my phone. I make efforts to meet people but they
5    all just ignore me. I spent the entire 2020 pandemic alone and I will
     never recover from the damage that it did to me. I had big dreams but
6    they were destroyed. I had many goals but will always fail. No
     friends, no family. I feel rejected from society and I want to
7    destroy it. I want to do a mass shooting. Feeling very inspired by
     recent events but most of these shooter are cowards that did not even
8    try. My life is hell and misery, just waiting to die alone. I am
     hated by the world for being born an ugly, mixed race, nigger mutt
9    only with child, only child with retard parents. I have plan
     specification to mow down crowds. I can probably get a high body
10   count by renting a truck and plowing through a crowd than I can with
     a gun. I also want to employ a bipod machine gun in a hall at a
11   school and when the bell rings just open fire on everything in the
     hallway or snipe some people on a freeway from a rooftop like I'm
12   playing GTA and stab families to death in front of a Christmas tree
     on Christmas eve. Since I won't ever be accepted by the world, why
13   should I care about who I harm? If I am not meant to be accepted by
     society, my role is to destroy it. Don't ghost your people or they
14   might go kill someone. Thank you listening to my Tedtalk;" and

15

16              b.   "immigrants have taken over the city. There is no soul
     in anything anymore. They fuck over anybody that they can, they have
17   their own clubs. That's why their clubs need to get shot up too.
     Going to throw a grenade in there and lock the door.
18

19   According to Discord records, the phone number associated with the

20   "Earth God" user is the 2379 Number, and the email address associated

21   with the user is drestackems@gmail.com, the same address previously

22   associated with defendant, as discussed above.

23        Discord records further show that the IP address associated from

24   which the "Earth God" Discord account connected to Discord resolved

25   to a Charter Communications subscriber.  Charter Communications

26   records indicated that the subscriber was an Andre Lackner with

27   service address 17813 Prairie Street, Northridge, CA (the "Northridge

28   Residence").

                                      7

**C.   Defendant's Mental Health Hold**

On May 29, 2022, the FBI obtained GPS location information for the 2379 Number and saw that the phone was located at the Northridge Residence.  On June 1, 2022, law enforcement officers found defendant in a one-bedroom back structure located at the Northridge Residence. LAPD officers detained defendant for a mental evaluation.  Defendant was transported to the Los Angeles County Olive View Hospital and was placed on a 5150 mental evaluation for 72 hours, then released.

**D.   Defendant's Harassment and Intimidation of Victim M.S.**

In an interview with the FBI, Victim M.S. reported that she first met defendant in approximately 2006 while they both attended school at Santa Monica College ("SMC").  Defendant provided Victim M.S. with his phone number and email address to communicate.  The phone number he provided was the 2379 Number and the email address he provided was andrelackner@gmail.com.

In 2010, Victim M.S. returned to SMC for summer classes and reconnected with defendant and had an approximately two-month romantic relationship with defendant.  The relationship did not last, but Victim M.S. remained friendly with defendant.  On one occasion after the breakup, defendant asked Victim M.S. to take him to the emergency room because he had become angry and kicked a wall.  Victim M.S. drove him to the emergency room but did not stay.  She began to distance herself from defendant after that incident.

The two remained loosely in touch until about 2014 when Victim M.S. and defendant reconnected.  However, when they met up in person, Victim M.S. did not feel comfortable with the relationship and began to distance herself from defendant.  After that, defendant would occasionally reach out to Victim M.S. to say hello or ask for advice

8

and Victim M.S. would respond cordially.  In June 2021, defendant
began to send concerning texts to Victim M.S. from the 2379 Number
about hurting himself and others, including the following three
messages, all sent on June 13, 2021:

> *a.*   "Sometimes I wonder if The World is trying to
>         turn me into a murderer;"
>
> *b.*   "So since everyone cuts me off and treats me like
>         they don't exist, maybe I am meant to give this
>         world a message no one is able to ignore;" and
>
> *c.*   "I feel like the only choice in life left, after
>         I lose my mom, is to either shoot myself or take
>         a lot of people with me because I'll never have
>         friends again."

Victim M.S. was very distressed and concerned for defendant's
safety and the safety of others around him.  She contacted her family
for help and asked for advice on how to deal with the situation.  She
decided to help defendant because he was an old friend and so she
called defendant and left a voicemail.  She then began to respond via
text message and encouraged defendant to get help.  She offered
various resources and defendant continued to tell Victim M.S. that
there was nothing more he could do and that he had tried everything.
Toward the end of the conversation, she told him she would report any
similarly worrying messages from him going forward.  Specifically,
she said:

> "I just want you to know in advance that because I care about
> your well-being and safety if I were to receive messages like
> those again I will report them.  Not because I'm out to get you
> but because my priority would be the safety of you and those
> around you."

To that, defendant responded:

"Well I am being watched and have gotten the legal trouble

before, so being report[ed] would probably result in jail time

for me"

"But knowing you are this eager to get me thrown in the slammer,

just reinforces my belief that people hate me"

Victim M.S. responded that she was not trying to get him thrown

in jail, and reiterated that she cares about defendant's safety and

that of the people around him.  They texted some more and ended the

conversation on good terms.

In August 2021, defendant asked Victim M.S. if she still lived

in Los Angeles and if they could hang out.  Victim M.S. responded

that it wouldn't be appropriate given their history and that she was

in another relationship.  Defendant responded with several messages,

all on August 14, 2021, which included the following:

d.    "you're not the only Jew friend that's been fake

to me and cut me off . . . . Not everyone can live up

to Jewish standards because we don't have the same

cultural background or advantages in society. . . .

Delete my number and block me. Fuck pen pal bullshit.

Hit me up for the threesome if you change your mind.

peace [peace emoji]."

Victim M.S. did not respond.  On October 31, 2021, defendant sent her

another series of text messages, this time containing overly anti-

Semitic comments and threats, several of which are quoted below:

e.    "All the kikes cut me off. The Jew has no tolerance

towards other people that don't have the similar upbringing as

them."

f.   "The Jews love gravitating towards black entertainers so they can use them with their own selfish intentions, even if it's just to be entertained. But at the end of the day these parasites are only pursuing Zionist and Jewish interests;"

g.   "The Asians are even worse, we need to start more Asian hate and wipe these alien gooks off the planet too;"

h.   "Chinks and kikes are the only true protected groups. You can say whatever you want about niggers and wetbacks nobody cares, but dare speak up about chang or shalom and youre cancelled;"

i.   "I'm tired of kikes putting me down all the time. Maybe Hitler was on to something. You guys pretend to be multicultural so you can get more power, you masquerade as people of color but at the end of the day you were only concerned about jews, just like the groups who claim to be people of color that once they get into a favorable position they immediately discriminate against other minorities;"

j.   "I honestly wish I never went to Smc and didn't have to be around the sheltered Jews that grew up with easy and safe lives, I should've stayed with my own ghetto trash nigger kind. The Jews and Chinks own everything in LA and I will never be accepted by them, The Jews and Chinks own all the digital platforms where they spread hate speech and censor black people. Facey non-Jews as objects to be used. They must go."; and

k.   "And I wish these anne franks would stop fetishizing black men and seeing us as sexual objects, because at the end of the day you will never marry outside of Jewish anyway."

11

1   Victim M.S. did not respond to these texts.  On January 22, 2022,
2   defendant texted her again:

3          l.   "I wish I could walk all these kikes to the gas
4      chamber myself."

5          m.   "Why do the Hebrew think that just because money is
6      involved they have the right to be arrogant nasty and
7      disrespectful towards everyone else in the workplace? I realize
8      I don't hate white people as much as the Jews, it's the Jews
9      that have been extremely rude and down pudding [sic]. You guys
10     think you are better than everyone else and talk down to
11     everyone. You have zero tolerance towards anyone who doesn't fit
12     your cultural standards. That's why you need to be walked back
13     to the gas chamber where you belong.

14         n.   "And you pretend to be anti-racist because you know
15     that you are a minority yourself, but I see through your
16     bullshit, and I want to see every single Jew exterminated from
17     this earth."

18  Victim M.S. was very distraught from the text messages that she was
19  receiving from defendant.  Victim M.S.'s parents lived in Los Angeles
20  and defendant had visited Victim M.S. at her parents' address when
21  they briefly dated in 2010.  Victim M.S. no longer lived with her
22  parents but was in fear for their lives and the lives of other Jewish
23  people.  She was scared that defendant would attempt to find her and
24  possibly kill her because of how angry he seemed and for the fact
25  that she was Jewish.  Defendant's messages about exterminating Jewish
26  people and the threats to kill many people caused significant
27  distress that has caused Victim M.S. to take time off of work.

28

Victim M.S. reported the text messages to the San Diego Police Department in January 2022.  Around that time, Victim M.S. also blocked the 2379 Number so that she couldn't receive the text messages.  However, in October 2022, she discovered that the messages had continued to come through on her laptop via iMessage.

On March 7, 2022, defendant wrote:

o.   "Remember, Hitler was right about the kikes".

On March 8, 2022, defendant wrote:

p.   "Hey Jude"

On March 11, 2022, defendant sent a video in which an unknown subject appears to have a firearm and is about to commit suicide.

On August 7, 2022, defendant sent the following texts:

q.   "Would you like to celebrate the next synagogue shooting?

r.   "I used to hate white people until I realize the people who have been nasty in disrespectful To me all these years weren't white, they were Jewish. I sympathize more with neo-Nazis now because I understand that they were right."

On October 17, 2022, Victim M.S. received an email from defendant via email address andrelackner@gmail.com titled, "death to kikes".  The email stated:

"The more I learn about Jews and realize most of the disrespect, mistreatment, racism, and humiliation I received in my life wasn't from whites, but from Jews. I mistook you as the same race and realized it's the Jews who have caused most of the problems in my life and in the world today. You see us black people as your pets, your cattle to fetishize. That's why you had no problem putting me down for being poor and growing up in

13

the ghetto Putting me down for not having a privileged Jew job.
Putting me down for not growing up on the westside and have all
society cater to me for being Jewish.

Hitler was right about you people. The holocaust never happened.
And if it did, you deserved it.

I will make sure I kill a Jew before I leave this earth."

Victim M.S. was in fear for her safety and that of her parents
after receiving this email, and reported the email that day to the
FBI via tips.fbi.gov.  Specifically, she reported the following:

"I am extremely concerned that he will follow-through with one
of his threats. In his latest e-mail to me on 10/17/22 he ended
it saying 'I will make sure I will a Jew before I leave this
earth.' He knows I'm Jewish and has sent many anti-semitic
messages to me saying that Jews need to be taken back to the gas
chamber, etc.  At the time we were friends I was living at home
with my parents and they still live in the same house along with
my brother and his girlfriend. I am VERY concerned that he
remembers where my family lives and could go there and do
something to them, or do something like a mass shooting in a
public place, etc. . . ."

**E.   Procedural History**

On December 20, 2022, defendant was charged in a single-count
indictment alleging a violation of 18 U.S.C. §§ 2261A(2)(B),
2261(b)(5) (Stalking).  (Dkt. 1.)  The government filed a notice of
request for detention on the same day.  (Dkt. 6.)  Defendant was
arrested and made his initial appearance, and post-indictment
arraignment, on December 21, 2022.  (Dkt. 8.)  At that time, this
Court held a contested detention hearing, and the Court ordered the

14

defendant permanently detained.  (Id.)  Notably, prior to that hearing, defendant's father told pretrial services that he believed defendant was a danger to the community and should be detained. Defendant's father's partner noted that due to defendant's ongoing threats of violence, they had almost obtained a restraining order against the defendant.  They also noted that within the 24 hours prior to his arrest, defendant had threatened to perpetrate a mass shooting when his mother dies, a threat they said he has made many times before.  Defendant's father's partner stated that she feared the defendant, and stated that she shared the information with Pretrial Services because she believed the Court needed to know that defendant may be a danger.

**IV.  DEFENDANT HAS NO NEW INFORMATION**

The government notes that this Court should not consider any additional information that was available to defendant at the time of his initial detention hearing.  Dillon, 938 F.2d at 1415 (affirming district court's refusal to reopen hearing where defendant's affidavits and letters – while not in existence at the time of his initial detention hearing – could have been obtained by defendant before his initial detention hearing).  To the extent that defendant presents sureties that were available at his detention hearing on December 21, 2022, this Court should not consider them.

**V.  DEFENDANT IS A DANGER TO THE COMMUNITY AND A FLIGHT RISK**

Defendant is a clear and present danger to the community.  His history of making terrifying threats of violence, including mass shooting and mass casualty events, combined with his history of stalking and the genuine fear of those who know him well that he may actually follow through on those threats, presents a risk to society

that cannot be overstated.  Separately, his history of stalking – and his proximity to a prior victim only 4 days after threatening her life – are a reminder that Victim M.S.'s fears for her own life should be taken extremely seriously.

## A.  Nature and Circumstances of the Offenses

Defendant is charged with a violation of 18 U.S.C. §§ 2261A(2)(B), 2261(b)(5) (Stalking).  The nature and circumstances of the offense weighs heavily in favor of detention.  Defendant's conduct involves repeated threats of extreme violence, including mass shootings, with defendant repeatedly calling for the murder of Jews and Asians, and promising to "kill a Jew before he leaves this earth."  Given defendant's history, described more fully below, his threats must be taken seriously.

## B.  Weight of the Evidence

The weight of the evidence is extremely strong.  Defendant's own words and actions constitute the offense.  His words are recorded in social media posts, individual text messages, and emails.  Finally, in a Mirandized and recorded statement to law enforcement, defendant admitted the conduct.

## C.  History and Characteristics of the Defendant

Defendant's history and characteristics are extremely troubling and demonstrate that he is both a danger and a flight risk.

### 1.  Danger

Defendant's statements and actions demonstrate that he likely seeks to inflict violence on others, and at the very least, indisputably seeks to terrorize his victims and make them fear for their lives.  Victim M.S., who had previously dated defendant and remained friends with him for years, and who compassionately advised

16

him to seek out mental health treatment after some of his initial
threatening statements, genuinely believes him capable of following
through on his threats and conducting a mass casualty event or
harming her or her family.  Defendant's own father, prior to his
initial detention hearing, told Pretrial Services that he believed
defendant was a threat to the community and that he should be
detained.  He and his partner told Pretrial Services that defendant
had, less than 24 hours prior to his arrest, threatened a mass
casualty event, and that they took him seriously.  Defendant's
father's partner told Pretrial Services that she feared the
defendant, and was hesitant to come forward with her concerns as a
result, but ultimately believed the Court should be informed that
defendant could pose a real danger if released.

Defendant also has a history of taking concrete actions to back
up his threats.  For example, in 2017, only four days after defendant
called his former teacher and threatened to kill her, he showed up at
the park where she was walking her dog.  She called the police,
leading to his arrest and conviction for criminal threats with the
intent to terrorize.  Defendant's threats of perpetrating a mass
shooting on a cruise ship also reflected that he had taken
substantial steps toward his plan. After stating that he was planning
to buy guns in Texas and shoot my way onto a cruise ship, he wrote
that he had been "studying layouts and blueprints to find good trap
areas."

Moreover, defendant's focus on mental health undermines rather
than supports his argument for pretrial release.  He and his
supporters have all acknowledged that he was diagnosed with bipolar
disorder over a decade ago, and more recently with borderline

17

personality disorder, and has received mental health treatment over the years, but that has not prevented his terroristic threats from continuing.   His former roommate notes that Lackner "lacked emotional and mental health support in his community," (Ex. G to Defendant's Brief), and his own father and father's partner believed he was a danger to the community in need of detention at his prior detention hearing only a few months ago.  Accordingly, the fact that he is able to stay on his medications while in detention is a better argument for continued detention than for pretrial release.

        2.   <u>Risk of Nonappearance</u>

    Finally, defendant's history of erratic, unpredictable behavior demonstrates he is a serious risk of nonappearance.  Accordingly, his history and characteristics demonstrate that he is both a danger and flight risk.

    **D.**    **Nature and Seriousness of the Danger to Any Person or the Community that Would Be Posed by the Defendant's Release**

    The seriousness of the danger defendant poses to himself and others cannot be overstated.  Defendant's mass casualty threats are extremely disturbing, and several of the people who know him well informed the government before his prior detention hearing that they take his threats seriously, feared for their safety, and believed defendant should be detained for the safety of the community.  There is no reason to believe that defendant's commitment to pursuing mental health treatment upon release will mitigate these concerns, particularly given that he has previously received mental health treatment, including at least one hospitalization for mental illness.

    At the very least, defendant poses a danger to his current and potential stalking victims.  Even if defense counsel is correct that

he would never follow through on his threats to perpetrate a mass shooting or mass casualty, defendant has proven himself capable of terrorizing individual victims, making them fear for their lives, seek out restraining orders, and in the case of Victim M.S., causing her to take time off of work because of the emotional distress of living with his threats.

**VI.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny defendant's request for release.  Should the Court grant defendant's request for release, the government would respectfully request leave to appeal the decision to the District Court.