CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
LISA LABARRE (Bar No. 246429)
(E-Mail: Lisa_LaBarre@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-1476
Facsimile: (213) 894-0081

Attorneys for Defendant
ANDRE MORROW LACKNER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. 2:22-cr-00603-DSF |
|---|---|
| Plaintiff, | **DEFENDANT'S POSITION REGARDING SENTENCING; EXHIBITS** |
| v. | |
| ANDRE MORROW LACKNER, | Hearing Date: June 3, 2024<br>Hearing Time: 10:00 a.m. |
| Defendant. | |

Defendant Andre Morrow Lackner, through his attorney of record Deputy Federal Public Defender Lisa LaBarre, hereby submits his position regarding sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: May 20, 2024          By  */s/ Lisa LaBarre*
                                 LISA LABARRE
                                 Deputy Federal Public Defender

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Andre Lackner is a promising young man whose life path has been significantly disrupted by Bipolar Disorder. At the time of offense in 2021, Andre Lackner was unmedicated, not receiving treatment, and had no plan in place to address his mental health issues. Mr. Lackner's mental health condition is directly linked to the offense here: sending a series of highly offensive messages to a (now former) friend. Mr. Lackner had isolated himself from friends and family and was also using marijuana and other controlled substances heavily. By pleading open to the indictment, Mr. Lackner has fully accepted responsibility for his actions. Mr. Lackner also expresses his deepest apology to M.S. for the harm she has suffered as a result of his messages.

Dr. Kele Kirschenbaum, Psy.D., evaluated Mr. Lackner and formally diagnosed him with Bipolar Disorder, Trauma Disorder, and severe Substance Use Disorders. Exhibit A, evaluation; Exhibit B, CV of Dr. Kirschenbaum. Dr. Kirschenbaum further states that "Now that Mr. Lackner's symptoms have stabilized, he was exceptionally remorseful, explained that his behavior was inconsistent with his actual beliefs and is eager to comply with treatment to avoid repeating past behaviors." Exhibit A at 2.

As of the date of sentencing, Mr. Lackner will have been custody for more than one year and five months.[1] Throughout his time in custody, he has diligently worked towards rehabilitation to ensure that this offense will never reoccur. Indeed, Mr. Lackner has been regularly attending Jewish services at MDC to combat the ignorance he expressed in his messages to M.S. Considering the many mitigating factors discussed below, a time served sentence is appropriate here.

///
///
///

---

[1] 17 months and 13 days.

1

## II. THE PRESENTENCE REPORT AND RECOMMENDATION

### A. Objection to the Hate Crime Enhancement

Mr. Lackner objects to the assessment of the hate crime enhancement, U.S.S.G. § 3A1.1. Mr. Lackner did not intentionally target M.S. based on her religion, and caselaw does not support the application of the enhancement here.

To apply the 3-level enhancement for hate crime motivation, the Court at sentencing must determine "beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived … religion … of any person." *See*, *e.g.*, *United States v. Armstrong*, 620 F.3d 1172, 1175 (9th Cir. 2010) (to establish eligibility for sentence enhancement under U.S.S.G. § 3A1.1(a), "the Government was required to prove that the victim's race was a motivating factor for the attack."). Application Note 1 confirms that "special evidentiary requirements govern the application of this subsection." In justifying the application of this enhancement, the Probation Office argues that "[w]hile Lackner did not initially communicate with Victim 1 based on her religious group, as soon as his messages turned toward harassment and threats, they were solely focused on Victim 1's religious group." PSR ¶ 33.

Although Mr. Lackner used antisemitic language in his messages to M.S., he did not intentionally select her because she is Jewish. M.S. and Mr. Lackner first met in 2006 as school acquaintances, and they subsequently engaged in a two-month long romantic relationship. PSR ¶ 5. M.S. ended the relationship with Mr. Lackner, and after the relationship ended she rejected Mr. Lackner's flirtatious behavior and desire to reconnect. *Id*. The initial messages cited in the PSR clearly reflect Mr. Lackner's complaints about his social isolation and rejection by M.S.: "So since everyone cuts me off and treats me like I don't exist, maybe I am meant to give this world a message no one is able to ignore" / "But knowing you are this eager to get me thrown in the slammer, just reinforces my belief that people hate me" / "Delete my number and block me. Fuck pen pal bullshit." PSR ¶¶ 8-10. Mr. Lackner did not "intentionally select"

2

M.S. "solely" due to her religion; rather, Mr. Lackner targeted M.S. due to his feelings of rejection.

In *United States v. Boylan*, a municipal judge pleaded guilty to wire fraud for, among other things, reducing traffic fines and penalties for exclusively female municipal court defendants in exchange for sexual favors. 5 F.Supp.2d 274, 276, 283 (D.N.J. 1998). The district court in that case imposed a 2-level vulnerable victim enhancement based on the defendant selecting poor individuals, but rejected a 3-level hate crime enhancement since it did "not appear beyond a reasonable doubt that the primary motivation for the offense was a hatred of" the victims. *Id.* at 283.

In *Masmari v. United States*, the defendant was convicted of arson for setting a fire at a crowded gay night club in Seattle. Case No. C16-0540 RSM, 2016 WL 3280381, at *1 (W.D. Wash. Jun. 15, 2016). While the presentence report considered the potential of a 3-level hate crime enhancement based on one of the cooperating witnesses reporting that Mr. Masmari expressed the view that homosexuals should be exterminated, the report did not recommend the enhancement in part because the enhancement requires proof beyond a reasonable doubt. *Id.* at *2.

Here, it is not clear beyond a reasonable doubt that Mr. Lackner intentionally selected M.S. because she is Jewish. Mr. Lackner's primary motivation to target M.S. was rejection, not a hatred of Jewish persons. As such, Mr. Lackner should not be assessed the 3-level enhancement pursuant to § 3A1.1.

**B.     Supplemental Corrections to the PSR**

PSR page 2: Mr. Lackner considers himself to be biracial (mixed-race), not exclusively Black.

PSR ¶ 55: Lymer John Lackner is 66 years old, not 68.

PSR ¶ 88: Refers to "Malik," not Lackner.

PSR ¶ 93: This incident occurred in 2010.

PSR ¶ 94: Mr. Lackner had surgery on one herniated disc, but he has four herniated discs in total.

## III. THE APPROPRIATE SENTENCE

### A. A variance to a time-served sentence is appropriate based on Mr. Lackner's history and characteristics.

#### 1. Mr. Lackner's traumatic childhood: violence, neglect, and foster care

Mr. Lackner's childhood was replete with neglect, physical and verbal abuse, and exposure to violence. Exhibit A at 3-6. Mr. Lackner's father frequently hit his mother, and on one occasion, he attempted to run her over with his car. Mr. Lackner himself was verbally abused and beaten by his parents during childhood. As a result of this ongoing violence, Mr. Lackner was placed in foster care for a period of time. Mr. Lackner was eventually returned to his mother's care, but his mother was an animal hoarder who kept over thirty cats in a small home. As such, their home was filthy, urine-soaked, and flea-infested. Mr. Lackner's mother likely suffered from severe depression, and she neglected her son: he did not receive proper nutrition and was left alone for long periods of time. Mr. Lackner grew up in poverty, and the power was frequently turned off for non-payment.

Mr. Lackner was also a frequent target for assault and harassment by the local gangs who controlled his neighborhood. Mr. Lackner was bullied for being biracial and an outsider in his community. As a result of this instability and chaos, Mr. Lackner began to isolate himself, and used the internet and marijuana to escape from the stressors of his daily life. Dr. Kirschenbaum states that "Mr. Lackner's traumatic childhood experiences contributed to an unstable early life filled with overwhelming emotions and unresolved trauma, while lacking healthy identity development and the coping skills needed to manage adulthood." Exhibit A at 2.

#### 2. Mr. Lackner's successes: education and employment

Despite his troubled childhood, Mr. Lackner graduated from high school and obtained an Associate's Degree from Santa Monica College. He developed an affinity for dance and choreography, and performed with the South Bay Ballet for several

4

years, stopping only when he became too injured to dance. Mr. Lackner also formed a passion for yoga, and worked at several studios as an associate and later a teacher. He also owned his own business, Games vs. Hobbies LLC, which specialized in online retail sales and distribution. At the time of his arrest, Mr. Lackner was an undergraduate student at California State University, Northridge, and he wishes to re-enroll in school as his treatment allows.

### 3. Burgeoning mental illness and substance abuse

Symptoms of Mr. Lackner's bipolar disorder gradually started to present in his teenage years. Throughout his childhood, Mr. Lackner exhibited symptoms of a trauma disorder: feeling hypervigilant, anxious, flashbacks of abuse or violence, and "anger rushes" when he became irritable. Exhibit A at 7. He received a diagnosis of ADHD at age 13, and began experiencing manic episodes in high school: "freak outs" that involved him exhibiting impulsivity, becoming reactive with a dysregulated mood, and difficulty controlling emotions. *Id.* Mr. Lackner saw a psychiatrist in the 11th grade, received medication, and attended individual therapy.

Mr. Lackner first received a diagnosis of bipolar disorder at age 20. *Id.* Mr. Lackner's bipolar disorder symptoms left him impulsive and reactive, while his trauma disorder symptoms caused him to feel overwhelmed by worthlessness and rejection. *Id.* At around age 25, Mr. Lackner was put on medication for bipolar disorder but he soon stopped taking it. Subsequently, at around age 26, Mr. Lackner began engaging in self-harm behaviors and was hospitalized on a mental health hold for three days. *Id.* at 7-8.

Unfortunately, Mr. Lackner lacked proper guidance to ensure medication and therapy compliance. Mr. Lackner returned to living with his mother, which exacerbated his mental health symptoms. He also self-medicated with marijuana,

which did not address his underlying illness. Indeed, his heavy cannabis use likely exacerbated his symptoms of psychosis.[2]

### B.     The instant offense is a product of Mr. Lackner's mental illness.

Mr. Lackner is accused of sending offensive messages. He is not accused of committing acts of violence, or acting on any of the statements contained in those messages. He also has no history of committing acts of violence, and he has no felony conviction history.[3] At the time of the offense, Mr. Lackner was suffering from untreated mental illness and substance addiction, and had isolated himself from his family and friends. Mr. Lackner's father's prior statements reflect Mr. Lackner's then-estrangement from his family. Mr. Lackner had moved out of his mother's home and spent most of his day participating in online forums (such as Discord) that fueled his disordered thinking.

The COVID-19 pandemic further isolated Mr. Lackner and reduced the availability of mental health treatment. Indeed, in-person counseling and treatment was unavailable for most of the pandemic. Dr. Kirschenbaum notes that "Mr. Lackner struggled to manage his behavior when he lacked the stability and mental health treatment that is integral for an individual with his diagnoses." Exhibit A at 2. Dr. Kirschenbaum adds, "Without adequate mental health treatment, Mr. Lackner's symptoms became further exacerbated by the COVID-19 pandemic and self-isolating behaviors, as he became preoccupied with the internet and marijuana, and made decisions that were driven by his untreated mental health symptoms." *Id*. The instant offense is directly linked to Mr. Lackner's mental illness.

---

[2] https://www.brightquest.com/cannabis-induced-psychosis/ "[T]here are some troubling associations between marijuana use and the development or worsening of chronic psychotic conditions like schizophrenia."

[3] Mr. Lackner's prior misdemeanor conviction was set aside and dismissed. PSR ¶ 53.

### C. Mr. Lackner has reconnected with his family and friends and welcomes treatment.

Mr. Lackner is now receiving medication and therapy at MDC. Exhibit D at 2. Mr. Lackner receives Mirtazapine and Buspirone daily, and he is compliant with his medication regimen. Mr. Lackner admitted to BOP psychologist Ashley Hernandez that he needs help managing his mental health symptoms, and that he also wanted to engage in drug and alcohol treatment. *Id.* at 1. Indeed, psychologist Hernandez states that "inmate LACKNER appears stable and does not currently demonstrate active signs indicative of a major mental health disorder or acute distress." *Id.* Mr. Lackner also expressed his willingness to contact Psychology Services for routine and emergent reasons. *Id.*

Furthermore, his BOP case manager reports that he has remained incident-free at MDC, has volunteered assisting with orderly duties, and has been observed to have a calm, positive attitude. Exhibit E, letter from BOP case manager R. Sotela. Mr. Lackner worked in food service at MDC, and his supervisor noted that "Lackner is a great worker. He shows up every day ready to work with a good attitude. Lackner steps in and helps out with any job that needs to be done and completes them with quality results. Lackner has a good rapport with the staff and coworkers." Exhibit F, BOP work performance ratings (demonstrating consistent "outstanding" performance ratings).

Dr. Kirschenbaum concludes that:
> In the years since this event, Mr. Lackner has made efforts to gain stability in order to reduce the impact of his symptoms on his functioning. When examining Mr. Lackner's history, it is clear that his participation in treatment has resulted in improved decision-making and a reduction of the behaviors that were driven by his bipolar disorder symptoms. Additionally, even when receiving treatment in custody, Mr.

7

>Lackner has demonstrated a decrease in symptom-driven thoughts and behaviors. Since there is a clear relationship between the absence of treatment and Mr. Lackner's poor decision-making, if he is once again placed in a supportive treatment environment that will ensure medication compliance, he can continue his trajectory of stable and appropriate behavior.
>
>…
>
>It is my professional opinion that Mr. Lackner is amenable to treatment and accepting of medication offers. Mr. Lackner has the greatest likelihood for success with stable housing, employment, substance use treatment, therapy, and medication. With proper support and treatment, Mr. Lackner has the potential to improve his decision-making abilities, expand his repertoire of coping skills, and live a meaningful life.

*Id.* at 2-3.

Thankfully, while in custody Mr. Lackner reconnected with his mother and father. Father Lymer John Lackner writes: "He is a very intelligent, talented, and productive member of society when these disorder issues don't arise. When these issues randomly come up, a problem of disorientation happens. … Prison time is not the answer to this problem. Locking him up in a prison cell won't really fix anything. What he needs is professional monitored therapy from therapists that understand and know how to treat people with these specific types disorders, as well as anger management." Exhibit G, letters.

Mr. Lackner's mother, Cassandra Lackner, adds: "[P]lease know that Andre is a good person and has a loving family that wants to see him mentally and physically

8

well. We will continue to seek support from DiDi Hirsch mental health and NAMI as necessary. I love my son." *Id.*

Mr. Lackner also has substantial support from his friends, including Hala Khouri, a trauma specialist who trains social workers and mental health professionals. Ms. Khouri is well-aware of the nature of allegations and Mr. Lackner's illness, and writes:

> It's rare to see someone with a mental illness like him exhibit such self-awareness. I know the message he is charged with sending contained anti-semitic tropes and threats. He can also say negative things about immigrants as well as Black people. I know that the "real" Andre does not believe these things. My family is like family to him. My husband is Jewish, and I am an immigrant. He loves us like his own family.

*Id.* Reflecting her confidence that Mr. Lackner is not a danger to the community, she offered be a surety for Mr. Lackner. Additional friends and family echo that Mr. Lackner is an intelligent, thoughtful, and kind person who needs assistance managing his mental health. *See id.* To educate himself and to understand the plight of the Jewish community, Mr. Lackner has been regularly attending Jewish services at MDC and seeking spiritual guidance from the rabbi who conducts these services. Exhibit H, letter from Unit Manager J. Musgray; Exhibit I, letter from Andre Lackner.

The Office of the Federal Public Defender will also assist Mr. Lackner's needs on an ongoing basis. FPD social worker De Anna Dove will assist Mr. Lackner in applying for General Relief, Cal-Fresh, and Medi-Cal. Exhibit C. These benefits will provide Mr. Lackner with financial assistance, food, and medical insurance for his ongoing treatment. Ultimately, it is Mr. Lackner's intention to complete his Bachelor's Degree at Cal State Northridge.

With intensive mental health and drug treatment, Mr. Lackner poses no future risk of danger to the community. Upon release, Mr. Lackner will immediately report to Didi Hirsch Mental Services in Glendale for inpatient mental health treatment. As noted previously, Mr. Lackner is a prior patient of Didi Hirsch and their Full Service Partnership Program provides therapy, substance abuse treatment, housing, and medication.

### D. Mr. Lackner is deeply remorseful for his conduct.

Mr. Lackner acknowledges the wrongfulness of his conduct and expresses his deepest apologies to M.S., who he has hurt not only by his conduct but by the stress of this ongoing matter. Mr. Lackner has spent his time in custody reflecting upon the wrongfulness of his actions, the hurt he has caused, and how he needs to change and rehabilitate to ensure that this behavior will never reoccur. Mr. Lackner spent a significant amount of time working on his letter to the Court, and he expresses his sincere remorse and plans for rehabilitation:

> First and foremost I apologize for the all the ways I have harmed [M.S.] and her loved ones with my words and actions. I know I cannot replace the time and energy [M.S.] and her family lost, and I deeply regret what I have done to hurt her. I take full responsibility for my actions, and for not being diligent enough in seeking intervention that would prevented them from ever happening. I know that my comments were not only upsetting to [M.S.], hurtful to the Jewish community as a whole, and to other vulnerable groups.
>
> …
>
> During my extreme states I would often destroy relationships as a form of self harm, and did so in anger when she turned down my request to connect in person, and continued to express my frustration when I experienced other triggers for

10

months thereafter. Extreme loneliness for years flooded me with unbearable pain, and I'd engage in destructive behaviors to distract from it. Looking back, I wish I had dropped everything I was doing and went to a rehab program. I recognize it was my responsibility to take more drastic measures in finding intervention and I failed to do so, injuring [M.S.] and her loved ones as a result. When my mental state returned to normal, my last text message to [M.S.] was an apology, telling her I have no intentions to harm her or anyone else, and a promise to delete her contact information and never contact her again, a promise that I kept.

…

Being aware that the nature of my racial comments were extreme, I've taken sincere steps to deradicalize my thinking. I believe education is the best weapon against hateful ignorance, and for over a year I've attended Jewish Religious Services with Rabbi Levin to learn more about Jewish culture, customs, and philosophy. While I originally sought to become more informed, what I got out of it was so much more, as the teachings have helped me understand how to lead a meaningful life with charity and benefit to others.

…

When released, I will take advantage of resources to remain abstinent from mind-altering substances by complying with mental health treatment, building a supportive social network, and continuing my education while leveraging sustainable sources of income. I want to engage myself in a profession that

|   |   |
|---|---|
| 1 | serves others and addresses current issues society is facing |
| 2 | today. |
| 3 | … |
| 4 | This time of reflection has allowed me to identify the root |
| 5 | cause of my problems and how to address them. Through |
| 6 | meditation, reframing my attitude, and changing invalid |
| 7 | thinking patterns, I'm learning to love myself and practice |
| 8 | openheartedness with an infinite capacity to forgive-letting go |
| 9 | of resentment, and reaching towards the future with joy. |

Exhibit I, Letter from Andre Lackner.

By his guilty plea and his consistent expressions of remorse, Mr. Lackner has accepted full responsibility for his actions. A multi-year period of imprisonment beyond the time already served is not needed to further impress upon him the need to comply with the law going forward. *See United States v. Gall*, 552 U.S. 38, 59 (2007) ("Gall's self-motivated rehabilitation . . . lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts") (citing §§3553(a)(2)(B)–(C))). Indeed, research has shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." M. Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). Deterrence already been accomplished with this conviction and term of imprisonment: Mr. Lackner's first felony conviction and substantial period of incarceration.

And finally, with regards to the need for treatment, there is no question that his ability to receive extensive mental health treatment is better in the community than in prison. Mr. Lackner welcomes the opportunity to receive mental health treatment on supervised release.

## IV.  CONCLUSION

For the foregoing reasons, Mr. Lackner respectfully requests that the Court sentence him to time served plus supervised release with conditions requiring mental health and substance abuse treatment.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: May 20, 2024       By  /s/ Lisa LaBarre
                              LISA LABARRE
                              Deputy Federal Public Defender

# PROOF OF SERVICE

I, the undersigned, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **DEFENDANT'S POSITION REGARDING SENTENCING, EXHIBITS** on the following individual(s) by:

[] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows:

[ ] Placing same in an envelope for hand delivery addressed as follows:

[ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows:

[ ] Faxing same via facsimile machine addressed as follows:

[X] By e-mail as follows:

Jacqueline Lira, USPO
Jacqueline_Lira@cacp.uscourts.gov

This proof of service is executed in Los Angeles, California, on May 20, 2024.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

                                      *Crystal Diaz*            .
                                      **CRYSTAL DIAZ**