E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
AMANDA B. ELBOGEN (Cal. Bar No. 332505)
Assistant United States Attorneys
Terrorism and Export Crimes Section
     United States Attorney's Office
     312 N. Spring St., 15th floor
     Los Angeles, California 90012
     Telephone: (213) 894-5748
     Facsimile: (213) 894-0141
     Email:     amanda.elbogen@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 22-00603-DSF |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Hearing Date: June 3, 2024 |
| ANDRE MORROW LACKNER, | Hearing Time: 10:00 a.m. |
| Defendant. | Location: Courtroom of the Hon. Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Amanda Elbogen, hereby files its sentencing position regarding defendant Andre Morrow Lackner.

//

//

//

The government's sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Investigation Report, and any other evidence or argument that the Court may permit.  The government respectfully requests the opportunity to supplement its position as may become necessary.

Dated: May 20, 2024                    Respectfully submitted,

                                       E. MARTIN ESTRADA
                                       United States Attorney

                                       CAMERON L. SCHROEDER
                                       Assistant United States Attorney
                                       Chief, National Security Division


                                            /s/
                                       AMANDA B. ELBOGEN
                                       Assistant United States Attorneys

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant Andre Morrow Lackner terrorized his Jewish victim, M.S., with extremely disturbing anti-Semitic rhetoric and threats that caused M.S. to fear for her safety, that of her family, and that of the larger community.

Defendant has engaged in similar behavior before.  In 2017, he called his former high school teacher and threatened to kill her and her family.  Four days later, he showed up at the park where she was walking her dog.  He was arrested and convicted for making criminal threats with the intent to terrorize.  Defendant has also posted disturbing threats online, outlining his fantasies of committing mass shootings at schools, on cruise ships, and at the Coachella music festival.  These are not empty words.  Both M.S., a friend and former romantic partner,  as well as members of defendant's own immediate family, have believed him to be capable of executing on his threats.

The government concurs with the USPO's calculation of defendant's offense level of 20, criminal history category of II, and resulting Guidelines range of 37-46 months' incarceration.  For the reasons outlined below, the government recommends a high-end Guidelines sentence of 46 months' imprisonment, three years' supervised release, and a $100 special assessment.  Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a).

**II.   STATEMENT OF FACTS**

   **A.   Defendant's Harassment and Intimidation of Victim M.S.**

In an interview with the FBI, M.S. reported that she first met defendant in approximately 2006 while they both attended school at

Santa Monica College ("SMC").  In 2010, M.S. returned to SMC for summer classes and reconnected with defendant and had a brief romantic relationship with defendant.  The relationship did not last, but M.S. remained friendly with defendant.  On one occasion after the breakup, defendant asked M.S. to take him to the emergency room because he had become angry and kicked a wall.  M.S. drove him to the emergency room but did not stay.  She began to distance herself from defendant after that incident.

The two remained loosely in touch.  Defendant would occasionally reach out to M.S. to say hello or ask for advice and M.S. would respond cordially.  In June 2021, defendant began to send concerning texts to M.S. about hurting himself and others, including the following three messages, all sent on June 13, 2021:

> "Sometimes I wonder if The World is trying to turn me into a murderer;"
>
> "So since everyone cuts me off and treats me like they don't exist, maybe I am meant to give this world a message no one is able to ignore;" and
>
> "I feel like the only choice in life left, after I lose my mom, is to either shoot myself or take a lot of people with me because I'll never have friends again."

(Ex. A at USAO_000052-53.)  M.S. was very distressed and concerned for defendant's safety and the safety of others around him.  She contacted her family for help and asked for advice on how to deal with the situation.  She decided to help defendant because he was an old friend and so she called defendant and left a voicemail.  She then began to respond via text message and encouraged defendant to get help.  She offered various resources and defendant continued to tell M.S. that there was nothing more he could do and that he had tried everything.  Toward the end of the conversation, she told him

she would report any similarly worrying messages from him going forward. Specifically, she said:

> "I just want you to know in advance that because I care about your well-being and safety if I were to receive messages like those again I will report them. Not because I'm out to get you but because my priority would be the safety of you and those around you."

(Id. at USAO_000059-60.)

To that, defendant responded:

> "Well I am being watched and have gotten the legal trouble before, so being report[ed] would probably result in jail time for me"

> "But knowing you are this eager to get me thrown in the slammer, just reinforces my belief that people hate me"

(Id. at USAO_000060.) M.S. reiterated that she was concerned about defendant's safety and that of the people around him. They texted some more and ended the conversation on good terms. (Id. at USAO_000061.)

In August 2021, defendant asked M.S. if she still lived in Los Angeles and if they could hang out. (Id. at USAO_000062.) M.S. responded that it wouldn't be appropriate given their history and that she was in another relationship. (Id.) Defendant responded with several messages, all on August 14, 2021, which included the following:

> "you're not the only Jew friend that's been fake to me and cut me off . . . . Not everyone can live up to Jewish standards because we don't have the same cultural background or advantages in society. . . . Delete my number and block me. Fuck pen pal bullshit. Hit me up for the threesome if you change your mind. peace [peace emoji]."

(Id. at USAO_000063.) M.S. did not respond.

3

On October 31, 2021, defendant sent her another series of text messages, this time containing overtly anti-Semitic comments and threats, several of which are quoted below:

> "All the kikes cut me off. The Jew has no tolerance towards other people that don't have the similar upbringing as them."

> "The Jews love gravitating towards black entertainers so they can use them with their own selfish intentions, even if it's just to be entertained. But at the end of the day these parasites are only pursuing Zionist and Jewish interests;"

> "The Asians are even worse, we need to start more Asian hate and wipe these alien gooks off the planet too;"

> "Chinks and kikes are the only true protected groups.  You can say whatever you want about niggers and wetbacks nobody cares, but dare speak up about chang or shalom and youre cancelled;"

> "I'm tired of kikes putting me down all the time. **Maybe Hitler was on to something.** You guys pretend to be multicultural so you can get more power, you masquerade as people of color but at the end of the day you were only concerned about jews, just like the groups who claim to be people of color that once they get into a favorable position they immediately discriminate against other minorities;"

> "I honestly wish I never went to Smc and didn't have to be around the sheltered Jews that grew up with easy and safe lives, I should've stayed with my own ghetto trash nigger kind.  The **Jews and Chinks own everything in LA** and I will never be accepted by them, The Jews and Chinks own all the digital platforms where they spread hate speech and censor black people. [They see] non-Jews as objects to be used. **They must go**."; and

> "And I wish these anne franks would stop fetishizing black men and seeing us as sexual objects, because at the end of the day you will never marry outside of Jewish anyway."

(Id. at USAO_000063-64 (emphasis added).)  M.S. did not respond to these texts.  On January 22, 2022, defendant texted her again:

> "**I wish I could walk all these kikes to the gas chamber myself**."

> "Why do the Hebrew think that just because money is involved they have the right to be arrogant nasty and disrespectful towards everyone else in the workplace? I realize I don't hate

4

>  white people as much as the Jews, it's the Jews that have been extremely rude and down pudding [sic]. You guys think you are better than everyone else and talk down to everyone. You have zero tolerance towards anyone who doesn't fit your cultural standards. **That's why you need to be walked back to the gas chamber where you belong**."
>
> "And you pretend to be anti-racist because you know that you are a minority yourself, but I see through your bullshit, and **I want to see every single Jew exterminated from this earth**."

(Id. at USAO_000064-65 (emphasis added).) M.S. was very distraught from the text messages that she was receiving from defendant. M.S.'s parents lived in Los Angeles and defendant had visited M.S. at her parents' address before. M.S. no longer lived with her parents but was in fear for their lives and the lives of other Jewish people. She was scared that defendant would attempt to find her and possibly kill her because of how angry he seemed and for the fact that she was Jewish. Defendant's messages about exterminating Jewish people and the threats to kill many people caused significant distress that caused M.S. to take time off of work.

M.S. reported the text messages to local law enforcement in January 2022. Around that time, M.S. also blocked the defendant's phone number so that she couldn't receive the text messages. However, in October 2022, she discovered that the messages had continued to come through on her laptop via iMessage.

On March 7, 2022, defendant wrote:

> "**Remember, Hitler was right about the kikes**".

(Id. at USAO_000065 (emphasis added).)

On March 8, 2022, defendant wrote:

> "**Hey Jude**"

5

1  (Id. (emphasis added).)
2      On March 11, 2022, defendant sent a video in which an unknown
3  subject appears to have a firearm.
4      On August 7, 2022, defendant sent the following texts:
5      **"Would you like to celebrate the next synagogue shooting?**
6      "I used to hate white people until I realize the people who have
7      been nasty in disrespectful To me all these years weren't white,
       they were Jewish. **I sympathize more with neo-Nazis now because I**
8      **understand that they were right."**
9   (Id. (emphasis added))
10     On October 17, 2022, Victim M.S. received an email from
11 defendant via email address andrelackner@gmail.com titled, "death to
12 kikes".  The email stated:
13     "The more I learn about Jews and realize most of the disrespect,
14     mistreatment, racism, and humiliation I received in my life
15     wasn't from whites, but from Jews. I mistook you as the same
16     race and realized it's the Jews who have caused most of the
17     problems in my life and in the world today. You see us black
18     people as your pets, your cattle to fetishize. That's why you
19     had no problem putting me down for being poor and growing up in
20     the ghetto Putting me down for not having a privileged Jew job.
21     Putting me down for not growing up on the westside and have all
22     society cater to me for being Jewish.
23     **Hitler was right about you people**. The holocaust never happened.
24     And if it did, you deserved it.
25     **I will make sure I kill a Jew before I leave this earth.**"
26 (Exhibit B, October 17, 2022 email (emphasis added).)
27     M.S. feared for her safety and that of her family after
28 receiving this email, and reported the email that day to the FBI via

6

tips.fbi.gov. She told law enforcement that defendant was aware she was Jewish, and that she was concerned for her family's and the community's safety. She wrote:

> "Andre Lackner knows that me and my family are Jewish. . . . I am concerned he may remember where my family now lives in Los Angeles and that he might try to go there and hurt Jews, or that he might do something else in a public space where there are Jewish people. This has been going on for about a year and a half and is of great concern. If this is not a warning sign, I don't know what is. I would like to know that someone will contact him, get him the help he needs, and make sure he's flagged and is not allowed to purchase any weapons. Please let me know what I can do to support my family in staying safe and the community at large."

(Exhibit C, Victim M.S. Letter to Law Enforcement.)

In an interview with FBI agents in October 2022, she told the interviewing agents that she was hesitant to report the defendant because she was afraid that he would retaliate and try to kill her in the future. (Exhibit D, October 27, 2022 Victim Interview Report at USAO_000051.) M.S.'s parents asked her for a photo of the defendant, so they could identify him if he approached their residence in Los Angeles, and upgraded their home security system. (Id. at USAO_000050.)

**B. Defendant's Prior Conviction for Making Terroristic Threats**

On May 16, 2017, Victim T.T., a Venice High School teacher, received a threatening phone call from the defendant, a former student of hers. T.T. had not heard from defendant since he graduated from high school in 2006. In a police report filed with the Los Angeles County Sheriff's Department ("LASD"), Victim T.T. told LASD deputies that defendant said the following: "Hello you

7

1  fucking bitch. Why did you give me a DUU?"[1]  (Exhibit E, LASD
2  Incident Report.)

3    T.T. responded by asking who he was and recalls that defendant
4  responded, "don't worry who I am, I'll kill you and your family, you
5  fucking bitch and I know where your daughter lives.  I can't tell you
6  who I am because I'm fucking threatening you, you fucking bitch.  I
7  woke up at five in the morning I did all the fundraising and paid for
8  things with my own money."  Defendant added that he was bipolar and
9  had previously been incarcerated.[2]  He told T.T. that he would be
10 calling again soon.  T.T. identified the caller as defendant because
11 her caller ID showed the name "ANDRE LACKNER" on her phone (which
12 agents later verified through the toll records), and she also
13 recognized his voice.  Further investigation by LASD identified the
14 phone number used to make the threatening phone call as defendant's
15 phone number.

16   Four days later, on May 20, 2017, T.T. was walking in the Rueben
17 Ingold Park located at 4400 W. Mount Vernon Ave, Los Angeles, CA when
18 she noticed defendant walking in the park.  (Exhibit F, LASD
19 Supplemental Report.)  Defendant walked out of view and T.T. called
20 the police.  Deputies responded and after taking a report from T.T.,
21 went to defendant's registered home address at the time, 7070 Flight
22 Ave, Unit #203, Los Angeles, CA.  Deputies encountered defendant at
23 the residence and arrested him for the misdemeanor offense under
24 California Penal Code § 422 (Criminal Threats with the Intent to

---

[1] A "DUU" refers to an unsatisfactory grade.
[2] On May 20, 2017, defendant was arrested of driving while under the influence, and was sentenced to 13 days in jail and 36 months' probation. The conviction was set aside and dismissed per California Penal Code § 1203.4.

8

Terrorize).  Defendant was later convicted and sentenced to 2 days' imprisonment and 36 months' probation.

### C. Defendant's Instagram Threat to "Kill As Many People as I Can"

On May 23, 2017, a friend of Victim T.T., who had heard about the incident, found LACKNER'S Instagram page online.  Witness #1 reported to LASD that he/she saw a video in which he/she remembered LACKNER saying, "I want to kill as many people as I can and kill myself but I can't do that until my mom dies."  (Exhibit G, Report of Instagram Threat.)

A complaint was made to Instagram and the video was removed from the web page.  The reported Instagram page had the username "Andretheastronaut".

### D. Defendant's 2017 Threat to Shoot Up a School

On October 30, 2017, the FBI received an online tip regarding a school shooting threat in Los Angeles, CA.  (Exhibit G, School Shooting Threat Tip.)  The tipster had viewed a song posted by user "Andre the Astronaut" with the title, "a temporary upload because I am already in legal trouble" on the website Soundcloud.  The tipster reported that "Andre the Astronaut" had threatened to "shoot up a school" and stated he was "off his meds."  The tipster stated in his/her complaint: "Please follow up with this as I am extremely worried he will act on these statements.  The only relevant information I know about where he lives is that it's somewhere in Los Angeles."  (Id.)  The video has since been removed from Soundcloud.

Defendant was later linked to this threat, when, as described below, in 2022, the same username of "Andre the Astronaut" made a threat using similar language.  Law enforcement reviewed the

9

Soundcloud homepage for user "Andre the Astronaut" and saw that it included a profile picture that matched the description of defendant's DMV photo.

### E. Defendant Threatens Mass Killing at Coachella Festival

On May 11, 2020, the FBI received a tip regarding user "Its_A_Nice_Day" on reddit.com ("Reddit") who posted about committing mass killings at the Coachella festival in Indio, CA. (Exhibit I, Coachella Threat.) The posts were on a forum that was created for the upcoming Coachella festival. The post included the following message: "I always wanted to have a good coachella trip but I never could. Sometimes I get fantasies of doing a masskilling here like driving a truck through the audience, throwing grenades in the crowd, spraying a machine gun, going on stabbing spree . . . ." (Id.)

According to subscriber records provided by Reddit, the email address associated with the user "Its A Nice Day" is drestackems@gmail.com. According to Google records, the recovery email address for the drestackems@gmail.com address is andrelackner@gmail.com, and the phone number associated with the account is (310) 989-2379 ("the 2379 Number"). According to public databases, the 2379 Number is associated with defendant. It is also the same number defendant used to harass and threaten Victim M.S. On August 12, 2020, FBI Special Agents called the 2379 Number and defendant answered and identified himself.

### F. Defendant's Mass Shooting Threats on Discord

The Discord posts by user "Earth God", with associated Instagram account "andretheastronaut", included the following statements:

> "I feel rejected from society and I want to destroy it. I want to do a mass shooting. Feeling very inspired by recent events but most of these shooter are cowards that did not

10

>even try. My life is hell and misery, just waiting to die alone. I am hated by the world for being born an ugly, mixed race, nigger mutt only with child, only child with retard parents. I have plan specification to mow down crowds. I can probably get a high body count by renting a truck and plowing through a crowd than I can with a gun. I also want to employ a bipod machine gun in a hall at a school and when the bell rings just open fire on everything in the hallway or snipe some people on a freeway from a rooftop like I'm playing GTA and stab families to death in front of a Christmas tree on Christmas eve. Since I won't ever be accepted by the world, why should I care about who I harm? If I am not meant to be accepted by society, my role is to destroy it. Don't ghost your people or they might go kill someone. Thank you listening to my Tedtalk;"
>
>and
>
>"immigrants have taken over the city. There is no soul in anything anymore. They fuck over anybody that they can, they have their own clubs. That's why their clubs need to get shot up too. Going to throw a grenade in there and lock the door.

(Exhibit J, Discord Threats.) According to Discord records, the phone number associated with the "Earth God" user is the 2379 Number, and the email address associated with the user is drestackems@gmail.com, the same address previously associated with defendant, as referenced above.

Discord records further show that the IP address associated from which the "Earth God" Discord account connected to Discord resolved to a Charter Communications subscriber. Charter Communications records showed that the subscriber was an Andre Lackner with service address 17813 Prairie Street, Northridge, CA (the "Northridge Residence").

**G.  Defendant's Cruise Ship Threat**

On May 28, 2022, the FBI received tips regarding mass shooting threats that defendant made on Twitter and Discord.

11

The Twitter posts by user @DreStaxxxems, included the following statements:

> "i am inspired by recent events to do a mass shooting on a cruise ship, can i buy guns in texas without being a resident? i know a lot of ships take off from the port there;" and

> "i want to do a mass shooting on a cruise ship, i was planning to buy the guns in texas and and shoot my way onto one of the ships. I've been studying layouts and blueprints to find good trap areas. Can NRA make sure they can't restrict me from getting guns in texas?"

Law enforcement obtained screenshots of these posts. (Exhibit K, Cruise Ship Threat.) According to Twitter records, the phone number associated with the @DreStaxxxems account is the 2379 Number.

**H. Defendant's Mental Health Hold**

On May 29, 2022, the FBI obtained GPS location information for the 2379 Number and saw that the phone was located at the Northridge Residence. On June 1, 2022, law enforcement officers found defendant in a one-bedroom back structure located at the Northridge Residence. LAPD officers detained defendant for a mental evaluation. Defendant was transported to the Los Angeles County Olive View Hospital and was placed on a 5150 mental evaluation for 72 hours, then released.

**III. SENTENCING GUIDELINES CALCULATION**

In its Presentence Investigation Report ("PSR", Dkt. 31), the USPO determined that defendant had a base offense level of 18 for a violation of 18 U.S.C. §§ 2261A(2)(A),(B), per United States Sentencing Guidelines ("U.S.S.G.") § 2A6.2(a). (PSR ¶ 23.) A two-level enhancement was applied because the offense involved a pattern of stalking, threatening, harassing, or assaulting the same victim. (PSR ¶ 24; U.S.S.G. § 2A6.2(b)(1)(E).) An additional three-level enhancement was applied because the defendant intentionally selected

12

the victim of the offense because of her actual or perceived race, religion, national origin, ethnicity, gender, disability, or sexual orientation, per U.S.S.G. § 3A1.1(a). (PSR ¶¶ 30-33.) After a three-level reduction for acceptance of responsibility, USPO determined defendant's total offense level to be 20.

Probation also determined that defendant's prior criminal convictions resulted in a total criminal history score of 2, and a corresponding Criminal History Category of II. (PSR ¶ 56.)

Based on a total offense level of 20 and a Criminal History Category of II, USPO determined that defendant's advisory Guidelines range is 37 to 46 months' imprisonment (PSR ¶ 133), followed by a term of supervised release of 1 to 3 years. (PSR ¶ 136.) The government concurs with these calculations.

**IV. THE GOVERNMENT RECOMMENDS A HIGH-END GUIDELINES RANGE SENTENCE OF 46 MONTHS' IMPRISONMENT AND A 3-YEAR TERM OF SUPERVISED RELEASE**

The government recommends that the Court sentence defendant to a high-end Guidelines sentence of 46 months' imprisonment, followed by a three-year term of supervised release; a $100 special assessment; and no fine, as it appears defendant lacks the ability to pay a fine. (PSR ¶ 130.) Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

**A. Nature and Circumstances of the Offense**

The nature and circumstances of defendant's offense support the government's recommended sentence. 18 U.S.C. § 3553(a)(1). Defendant terrorized the Jewish victim in this case, making her fear for her life and her family's safety as he escalated his anti-Semitic rhetoric. Defendant's conduct included repeated threats of extreme

13

violence, repeatedly calling for the murder of Jews, and promising to "kill a Jew before he leaves this earth."  (See Exhibit B.)[3]

Defendant's harassment caused victim M.S. to need to take time off work, and caused her and her parents to take additional measures to ensure their own safety, including upgrading their home security system and not staying at home.  (PSR ¶ 18.)

### B. History and Characteristics of Defendant

Defendant's history and characteristics also warrant the government's recommended sentence, and demonstrate that he poses a serious danger to the public.  See 18 U.S.C. § 3553(a)(1).

Defendant's statements and actions demonstrate that he desires to inflict violence on others, and at the very least, indisputably seeks to terrorize his victims and make them fear for their lives. Victim M.S., who had previously dated defendant and remained friends with him for years, and who compassionately advised him to continue to seek out mental health treatment, genuinely believes him capable of following through on his threats and conducting a mass casualty event or harming her or her family.  Defendant's own father, prior to his initial detention hearing, told Pretrial Services that he believed defendant was a threat to the community and that he should be detained.  He and his partner told Pretrial Services that

---

[3] Defendant's objection to the application of the three-level victim-based enhancement defies common sense.  Defendant targeted the victim with anti-Semitic rhetoric because he knew she is Jewish. The fact that his anti-Semitic abuse began after he and the victim had an established relationship – and was prompted by his feelings of rejection – does not change the fact that he made the statements about Hitler, gas chambers, and wiping Jews off the planet because of the victim's identity.  This is further confirmed by his use of the phrase "you people" and his standalone text "Hey Jude."  There is abundant evidence that his harassment targeted his victim's religion and identity.

14

defendant had, less than 24 hours prior to his arrest, threatened a mass casualty event, and that they took him seriously. Defendant's father's partner told Pretrial Services that she feared the defendant, and was hesitant to come forward with her concerns as a result, but ultimately believed the Court should be informed that defendant could pose a real danger if released.

Defendant also has a history of taking concrete actions to back up his threats. In 2017, defendant stalked his former teacher, Victim T.T., and threatened to kill her and her family, noting that he knew where her daughter lived. (PSR ¶ 53.) Days later, defendant showed up in the park where she was walking her dog. (Id.)

Defendant has also made extremely disturbing and specific threats online, including posts threatening and/or fantasizing to shoot up a school, commit mass murder at Coachella, and perpetrate a mass shooting on a cruise ship. (PSR ¶¶ 42-48.) With regard to the latter threat, his posts indicated that he had studied the layouts and blueprints of cruise ships to find "good trap areas," and that he was contemplating purchasing guns in Texas, where many cruise ships depart. (Exhibit K, Cruise Ship Threat.)

In mitigation, it is clear that defendant struggles with serious mental health issues, and experienced a difficult and traumatic childhood. However, he and his supporters have all acknowledged that he was diagnosed with bipolar disorder over a decade ago and has received mental health treatment for many years, but that has not prevented his terroristic threats from continuing.

### C. The Need for the Sentence to Reflect the Seriousness of the Offenses, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public

The sentence must satisfy the need to punish defendant; reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence; and protect the public. 18 U.S.C. § 3553(a)(2). Here, the government's recommended sentence will provide deterrence both to defendant and to others who might otherwise be inclined to perpetrate a similar crime.

Finally, a three-year term of supervised release following imprisonment will provide an additional layer of deterrence and protection to the community. See 18 U.S.C. § 3583(c) (factors to be considered in including a term of supervised release). Defendant's criminal history, including his prior conviction for making terroristic threats, demonstrates that a three-year term of supervised release is necessary to effectively monitor defendant post-release. See U.S.S.G. § 5D1.1, comment n.3(B) ("The court should give particular consideration to the defendant's criminal history . . . . In general, the more serious the defendant's criminal history, the greater the need for supervision.").

### D. The Need to Avoid Unwarranted Disparities

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants. One way of doing so is to correctly calculate the Guidelines range and then sentence defendants within that range. See Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."). Here, under the correctly calculated Guidelines range,

16

other defendants "with similar records who have been found guilty of similar conduct" as defendant, can expect a prison sentence between 37 and 46 months' imprisonment. See U.S.S.G. § 5A (Sentencing Table). Consequently, the government's recommended sentence avoids an unwarranted disparity with similarly situated defendants.

### E. Fine

The government agrees with Probation that defendant does not appear to have the ability to pay a fine. (PSR ¶ 130.)

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to a high-end Guidelines sentence of: 46 months' imprisonment; three years' supervised release; a mandatory $100 special assessment; and no fine.